**MATTERHORN, INC.,**
**Plaintiff-Appellee,**

**v.**

**NCR CORPORATION,**
**Defendant-Appellant.**

**No. 84-2789.**

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1985.

Decided June 6, 1985.

William J. Reinke, Barnes & Thornburg, South Bend, Ind., for plaintiff-appellee.

R. Davy Eaglesfield, III, Mishkin, Cromer, Eaglesfield & Maher, Indianapolis, Ind., for defendant-appellant.

Before ESCHBACH and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

Matterhorn, Inc. brought a diversity suit against NCR Corporation (formerly National Cash Register) for breach of contract. NCR has filed an appeal, which raises a difficult issue of arbitrability, from the denial of its motion to compel Matterhorn to arbitrate the contract dispute, and to stay Matterhorn's lawsuit until the arbitration was completed. The motion was brought under 9 U.S.C. § 4, which provides a federal remedy against refusing to arbitrate when required to do so by a written arbitration agreement, and also provides that if the making of the agreement or the refusal to perform it by submitting to arbitration is in issue the district court must try the issue before deciding whether to order the defendant to arbitrate; and under 9 U.S.C. § 3, which empowers the court to stay any proceedings before it, pending arbitration.

The correctness of the district court's action depends on the proper interpretation of *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), where the Supreme Court distinguished between a challenge to the arbitration clause itself and to the overall contract containing the arbitration clause, and held that only the former challenge is to be tried under section 4; the latter is to be referred to the arbitrator. So, for example, a challenge based on fraud in the inducement of the whole contract (including the arbitration clause) is for the arbitrator, *Schacht v. Beacon Ins. Co.*, 742 F.2d 386, 389–90 (7th Cir.1984), while a challenge based on the lack of mutuality of the arbitration clause would be for the court, *Hull v. Norcom, Inc.*, 750 F.2d 1547, 1549–50 (11th Cir. 1985). As *Hull* implies, although section 4 (so far as relevant here) speaks only of challenges to "the making" of the agreement to arbitrate, the term has been held to encompass any challenge to the validity of the agreement, even if there is no disagreement that it was "made."

The distinction between attacking the whole contract and just the arbitration clause may seem puzzling—the dissenting Justices in *Prima Paint* found it so, and the majority opinion did not elucidate it—but several points can be made in elucidation:

1. If a court had to resolve a challenge to the validity of the entire contract before the arbitration could begin, the arbitrator, though the parties' designated arbiter of disputes under the contract, would have much less scope for decision than a judicial arbiter of contract disputes.

2. An arbitration clause will often be "severable" from the contract in which it is

embedded, in the sense that it may be valid even if the rest of the contract is invalid. If the agreement of one party to arbitrate disputes is fully supported by the other party's agreement to do likewise, there is no need to look elsewhere in the contract for consideration for the agreement to arbitrate; so objections to other parts of the contract, based on fraud or unconscionability or mistake or whatever, need not spill over to the arbitration clause. See *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 410–11 (2d Cir.1959), cert. dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960). This is not merely a formal point; it bears on the parties' intentions.

3. There would however be a severe problem of bootstrapping if a party to a contract could be forced to arbitrate the question whether he had been coerced or deceived into agreeing to arbitrate disputes arising under the contract.

In 1978 NCR and Matterhorn, in contemplation of Matterhorn's buying a computerized cash register for its restaurant, entered into a standard-form contract drafted by NCR and called the "Universal Agreement." (We omit some details of the transaction to simplify this opinion.) The Universal Agreement provided that it was to apply to anything that Matterhorn bought from NCR unless the Agreement was terminated in writing, that Matterhorn would order specific equipment by submitting a purchase order to NCR describing what it wanted, and that NCR's acceptance of the order would create a contract of sale consisting of the purchase order and the Universal Agreement. The Universal Agreement also provided that any dispute "arising out of or related to this Agreement and/or any contract hereafter entered into between NCR and Customer, or the breach thereof, or the furnishing of any equipment or service by NCR to Customer, shall be settled by arbitration."

As contemplated, shortly after the Universal Agreement was signed Matterhorn submitted a purchase order for a computerized cash register and NCR accepted the order. But a delay in filling it caused Matterhorn to cancel it. In January 1980, some nine months after the cancellation and 18 months after the signing of the Universal Agreement, NCR sent Matterhorn a new purchase order for the same cash register, though at a higher price. According to Matterhorn, NCR told it that it would have to sign the new order because the earlier "contract" had been cancelled. The purchase order contained two empty boxes. One had the following legend beside it: "FURNISHING OF EQUIPMENT, PROGRAMS AND/OR SERVICE IS DONE ONLY IN ACCORDANCE WITH AND PURSUANT TO OUR AGREEMENT DATED: U/A DATE ______________." The other said: "TERMS AND CONDITIONS ON REVERSE SIDE APPLY." Matterhorn signed the purchase order but did not check either box or fill in the blank for the date. NCR, when it received the order, checked the box for incorporation of the Universal Agreement and filled in the date of the Universal Agreement that Matterhorn had signed. The 1978 purchase order had contained the same boxes; only NCR had checked the Universal Agreement box (and filled in the date) before Matterhorn received and completed the order—had indeed checked both boxes.

The cash register was delivered, but according to Matterhorn malfunctioned, giving rise to this suit. When NCR moved for an order to arbitrate and for a stay pending arbitration, the district judge denied the motion on the ground that there was an issue whether the parties had agreed to arbitrate disputes under the 1980 purchase order and that the issue had to be tried before he could rule on the motion. NCR appealed, arguing that by denying a stay of an action at law the judge had refused to enjoin the action and thus that his order was immediately appealable under 28 U.S.C. § 1292(a)(1), which makes orders granting or denying injunctions appealable though nonfinal. We dismissed the appeal as premature, *Matterhorn, Inc. v. NCR Corp.*, 727 F.2d 629 (7th Cir.1984), because the judge had not definitely denied the

stay; he had just decided that a trial was necessary before he could decide whether to grant or deny it. It was much as if NCR had tried to appeal from a denial of a motion for summary judgment on its claim for an injunction; such a denial—a preliminary procedural ruling—is not appealable. *Switzerland Cheese Ass'n v. E. Horne's Market, Inc.*, 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966); see also *Donovan v. Robbins,* 752 F.2d 1170, 1172–74 (7th Cir.1985).

After the dismissal of NCR's appeal, a trial was held. The judge asked the jury to answer two questions: whether the parties in 1978 had entered into a "Universal Agreement" which included an arbitration clause, and whether the 1980 purchase order had incorporated the arbitration clause of the Universal Agreement. The jury answered the first question "yes," and the second "no," so the judge ruled that Matterhorn's breach of contract claim did not have to be arbitrated, and denied NCR's motions. NCR has appealed.

Although the judge's order does not wind up the litigation between the parties—quite the contrary, it sets the stage at long last for a determination of the merits of Matterhorn's breach of contract action, filed in 1982—and hence is not a final judgment, it nevertheless is appealable under the "*Enelow-Ettelson*" doctrine. This doctrine, on which see, e.g., *Matterhorn, Inc. v. NCR Corp., supra,* 727 F.2d at 630–33; *Medtronic, Inc. v. Intermedics, Inc.*, 725 F.2d 440, 442–44 (7th Cir.1984); *Hayes v. Allstate Ins. Co.*, 722 F.2d 1332, 1337–38 (7th Cir.1983) (dissenting opinion), allows the immediate appeal of an order granting or denying a stay sought on equitable grounds, provided the suit to be stayed is a suit at law (a suit for damages), which Matterhorn's suit is. Although as an original matter it is by no means clear that a stay of court proceedings pending arbitration is equitable in nature, see *id.* at 1339, countless decisions hold that it is. See, e.g., *Shanferoke Coal & Supply Corp. v. Westchester Service Corp.*, 293 U.S. 449, 452, 55 S.Ct. 313, 314, 79 L.Ed. 583 (1935); *H.C. Lawton, Jr., Inc. v. Truck Drivers, Chauffeurs & Helpers Local Union No. 384,* 755 F.2d 324, 327 (3d Cir.1985).

Besides denying NCR's request for a stay pending arbitration, the judge denied its request for an order that Matterhorn arbitrate the dispute; and an order to arbitrate is not deemed an injunction. We must consider what if any bearing this fact has on our appellate jurisdiction in this case.

Despite its resemblance to a mandatory injunction, an order to arbitrate is assimilated rather to a procedural order, such as a discovery order. Hence making or refusing to make such an order is not appealable under section 1292(a)(1). See, e.g., *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 84–85 (2d Cir. 1961) (Friendly, J.); *County of Durham v. Richards & Associates, Inc.*, 742 F.2d 811, 814 n. 5 (4th Cir.1984) (citing authorities); *Hayes v. Allstate Ins. Co., supra,* 722 F.2d at 1340–41 (dissenting opinion). Although *Langley v. Colonial Leasing Co.*, 707 F.2d 1, 5 (1st Cir.1983), holds that such an order is an injunction for purposes of applying the *Enelow-Ettelson* doctrine, we have refused to extend the doctrine in this way. *Ohio-Sealy Mattress Mfg. Co. v. Duncan,* 714 F.2d 740, 743 (7th Cir.1983).

True, if nothing remains pending in the district court, because the only thing sought in the suit was an order to arbitrate, then the order (or a final refusal to make the order) is the final decision in the case and is appealable under 28 U.S.C. § 1291, even though it is not appealable—in this circuit, anyway—under the *Enelow-Ettelson* doctrine, because it is not an injunction (or denial of an injunction, if the order is refused). See *University Life Ins. Co. v. Unimarc Ltd.*, 699 F.2d 846, 848 (7th Cir.1983); *Whyte v. THinc Consulting Group Int'l,* 659 F.2d 817, 818 n. 2 (7th Cir.1981); *County of Durham v. Richards & Associates, Inc., supra,* 742 F.2d at 813–14. But in this case other things do remain pending in the district court. This was not a suit by NCR for an order to arbitrate; it was a suit by Matterhorn for breach of

contract in which NCR made a motion for such an order by way of defense. Hence if all NCR had asked the district judge for was an order that Matterhorn arbitrate their dispute, we would have no appellate jurisdiction; the judge's denial of that order was not appealable since it did not wind up the case in the district court. But that is not all that NCR asked for and was refused. It also asked for a stay of the district court proceedings pending arbitration. The refusal of that stay is, as we said, immediately appealable under the *Enelow-Ettelson* doctrine, and brings up to us the same issues that we would have to decide if the judge's denial of the order to arbitrate were appealable immediately; for the grounds of the two denials were the same. Cf. *Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.*, 706 F.2d 155, 157–58 (6th Cir.1983); 9 Moore's Federal Practice ¶ 110.20[4.–1], at pp. 247–48 (2d ed. 1985).

This tissue of overrefined distinctions may someday exasperate the Supreme Court into overturning the *Enelow-Ettelson* doctrine—a course universally urged. See 9 Moore's Federal Practice, *supra*, ¶ 110.20[3], at p. 245; 16 Wright, Miller, Cooper & Gressman, Federal Practice and Procedure § 3923, at p. 53 and n. 14 (1977) (citing cases); *id.*, 1985 Supp. 25 n. 14 (more cases). It has been suggested that a bold court of appeals might do the overturning, on the basis of the enactment (after the last case in which the Supreme Court endorsed the doctrine) of 28 U.S.C. § 1292(b), which allows interlocutory appeals on controlling questions of law if both the district court and the court of appeals decide that the question ought to be appealed without waiting till the end of the case, and thus relieves some of the pressure for reading section 1292(a)(1) broadly, as the *Enelow-Ettelson* line of cases does. See Judge Rubin's dissenting opinion in *Mar-Len of Louisiana, Inc. v. Parsons-Gilbane*, 732 F.2d 444, 445–47 (5th Cir.1984), and 16 Wright, Miller, Cooper & Gressman, *supra*, § 3923, at p. 65. But we are naturally disinclined to consider such a step in a case where neither party asks us to take it; and neither party has asked us here.

A final observation on the jurisdictional issue: its difficulty stems in part from a lack of "fit" between sections 3 and 4 of the federal arbitration statute. The framers of the statute appear to have assumed that a section 3 stay would be used to stop a lawsuit begun by the party resisting arbitration, and then, if the stay didn't induce him to arbitrate—if he preferred a Mexican stand-off—the party wanting arbitration would bring a separate action under section 4. See S.Rep. No. 536, 68th Cong., 1st Sess. 3 (1924); Cohen & Dayton, *The New Federal Arbitration Law*, 12 Va.L.Rev. 265, 267 (1926). What has happened instead is that the party desiring arbitration will often, as in this case, file a motion under section 4 in the same case in which he has filed a section 3 motion. When this happens the sections run into each other and the appeal that the *Enelow-Ettelson* doctrine allows from the order disposing of the motion for a stay usually enables the appellant to bring up all the grounds on which the district judge's ruling on the section 4 motion was based, even though that ruling would have been appealable only if the lawsuit had been an independent section 4 action.

On the merits, we begin by noting that although Matterhorn's challenge to the arbitrability of its dispute over the 1980 purchase is not pinpointed to the arbitration clause, but is a challenge to the applicability of the "Universal Agreement" of which the arbitration clause is but one provision, *Prima Paint* is distinguishable. The contention there was that the entire contract of which the arbitration clause was a part had been induced by fraud and was therefore invalid from the start. Matterhorn does not challenge the validity of the Universal Agreement at the time it was made; it contends that the parties in 1980 made a new contract that did not incorporate the Universal Agreement. There is no doubt that the parties could cancel the Universal Agreement any time they wanted. It may have been universal, but it was not eternal.

Though it contains a clause forbidding cancellation other than in writing, and though such clauses (invalid at common law) now receive some protection under the Uniform Commercial Code, see UCC § 2–209(2); Farnsworth, Contracts § 7.6 (1982); see generally Note, *The Status of a "No Oral Modification" Clause Under the Restatement (Second) of Contracts,* 31 U.Pitt.L. Rev. 314 (1969), the purpose of such clauses is to prevent oral modification by a contracting party's agent, and one of Matterhorn's arguments is that the cancellation was by a superseding written contract, the 1980 purchase order. In any event, in determining the issue of arbitrability we are not concerned with the merits of Matterhorn's claim. Our point is only that the claim turns not on the validity of the Universal Agreement but on whether a subsequent transaction nullified the agreement. And that is as much a question about the subsequent transaction as about the Universal Agreement itself.

Of course by describing the question as one of the scope of the Universal Agreement we could make it seem as if Matterhorn were really raising a question about the meaning of the Universal Agreement—a question that only the arbitrator was authorized to answer. But "scope" would just be a fancy way of asking whether the Universal Agreement covered the 1980 sale, and that depends on what the parties intended when they made that sale. The two blank boxes—one for the terms on the reverse side of the order (terms that also require arbitration of any dispute), the other for incorporation of the Universal Agreement—make the Universal Agreement seem optional; they make it seem that if neither box was checked when the order form was received by the buyer, as happened, the buyer could check either one, or perhaps neither (in which event his rights would be governed by general contract law as codified in the Uniform Commercial Code). The argument may well be unsound, as we shall see, but it is an argument directed to the meaning of the 1980 transaction, not to the meaning of the Universal Agreement.

The issue is thus like that in *Great American Trading Corp. v. I.C.P. Cocoa, Inc.,* 629 F.2d 1282, 1288 (7th Cir.1980)—whether the parties had intended a novation (a superseding contract) of the contract that contained an arbitration clause—which we held was for the court rather than the arbitrator to decide. A similar decision is *J & R Sportwear & Co. v. Bobbie Brooks, Inc.,* 611 F.2d 29, 30 (3d Cir.1979). More recently, however, we held without citing *Great American* that the issue of rescission of a contract is for the arbitrator, provided the issue is within the scope of the arbitration clause. *Wilson Wear, Inc. v. United Merchants & Mfrs., Inc.,* 713 F.2d 324, 327–28 (7th Cir.1983); see also *Maria Victoria Naviera, S.A. v. Cementos del Valle, S.A.,* 759 F.2d 1027, 1031 (2d Cir.1985) (per curiam). But we added another proviso: "and the parties have not otherwise demonstrated an intention to the contrary." 713 F.2d at 328. Matterhorn contends that the parties did not intend the arbitrator to resolve disputes under the 1980 purchase order, because NCR had not checked either box that would have incorporated an arbitration clause.

A similar distinction made in *Prima Paint* supports our effort to draw what may seem a razor-thin distinction between *Great American* and *Wilson Wear.* The Supreme Court pointed out that the court whose decision it was reviewing did not treat arbitration clauses as severable if "*the parties otherwise intend,*" and "has been careful to honor evidence that the parties intended to withhold such issues from the arbitrators and to reserve them for judicial resolution." 388 U.S. at 402 and n. 9, 87 S.Ct. at 1805 and n. 9 (emphasis in original). The precise meaning of *Prima Paint,* therefore, is somewhat more limited than we first suggested: issues going to the validity of the entire contract, including the arbitration clause, are for the arbitrator when the parties so intend. Sometimes they do not so intend. To take an extreme case, suppose that in the 1980 purchase order Matterhorn had checked a box which said that the parties would un-

der no condition attempt to refer any dispute to arbitration. It would be far-fetched to argue that the question of the order's effect on the Universal Agreement would have to be submitted to arbitration pursuant to the arbitration clause in that Agreement.

The Second Circuit in the *Maria Victoria Naviera* case treated the issue of modification of the original contract containing the arbitration clause as one for the court, but the separate issue whether the contract had been cancelled as one for the arbitrator. See at 1030–31. The distinction, if applied here, would of course put this case in the camp of *Great American* rather than *Wilson Wear.* The distinction was a fairly easy one to make on the facts of *Maria Victoria Naviera* because the alleged cancellation was by unilateral action of one party, and not by a superseding contract. The only contractual issue to be determined, therefore, was the effect of that action on the original contract; a subsequent contract did not have to be construed before the arbitrability of the dispute under the superseded contract could be determined. But as the distinction is not so clear in other cases, we are reluctant to embrace a general rule that modifications or novations are for the court and cancellations for the arbitrator. In *Wilson Wear,* for example, the basis of the cancellation was an alleged oral agreement designed to supersede the written contract that had the arbitration clause; and the oral contract could equally well have been described as a novation.

The question of arbitrability ought to turn not on what the method of supersession is called, but on whether the court can infer from the whole course of dealings between the parties that they intended the arbitration clause in their initial contract to govern disputes arising out of the alleged attempt to supersede that contract. "[T]he party who has refused to arbitrate because he believes in good faith that his agreement does not bind him to arbitrate, *or that the agreement is not applicable to the controversy,* is protected by the provision of the law which requires the court to examine into the merits of such a claim." Cohen & Dayton, *supra,* at 271 (emphasis added). See also *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH,* 585 F.2d 39, 44–45 (3d Cir. 1978); *Korody Marine Corp. v. Minerals & Chemicals Philipp Corp.,* 300 F.2d 124, 125 (2d Cir.1962) (per curiam). When Matterhorn signed a contract that seemed not to incorporate any set of terms that contained an arbitration clause, it may have intended and reasonably believed that it would not be forced to arbitrate disputes arising under the contract. There is enough doubt to make the issue one for the district court rather than the arbitrator.

NCR next argues that even if the issue of whether the parties had agreed to arbitrate disputes under the 1980 sale was triable, the jury's verdict had so little evidentiary support that it cannot stand. The presence of a jury in this case should not go unmentioned. Although it is fairly clear that the interpretation of a contract is a matter of fact when as in this case interpretation requires consideration of inconsistent documents and of oral testimony, see, e.g., *Western Industries, Inc. v. Newcor Canada Ltd.,* 739 F.2d 1198, 1205 (7th Cir.1984); *Antilles S.S. Co. v. Members of American Hull Ins. Syndicate,* 733 F.2d 195, 204, 207 (2d Cir.1984) (Newman, J., concurring), it is not at all clear that the issue should be determined by a jury when, as also in this case, it arises in the course of deciding whether court proceedings should be stayed and the parties ordered to arbitrate, see *J & R Sportswear & Co. v. Bobbie Brooks, Inc., supra,* 611 F.2d at 30—an equitable decision, under the *Shanferoke* line of cases. See also *Oasis Oil & Refining Corp. v. Armada Transport & Refining Co.,* 719 F.2d 124, 126 (5th Cir. 1983). However, 9 U.S.C. § 4 creates an explicit right to trial by jury in the proceeding to determine whether an order to arbitrate should be issued. Here of course section 3 is in play as well as section 4; and there is no independent section 4 proceeding—there is as we noted earlier just a

section 4 motion interposed by way of defense to Matterhorn's breach of contract claim. The precise dimensions of the right to jury trial in such a complex setting need not be determined here, since NCR makes no objection to trial by jury and thus has waived any objection it might have made. We raise the question only to indicate that it is indeed a question.

The jury's verdict was surprising. The purchase order that Matterhorn signed in 1980 was not, on its face anyway, a complete contract (the other box—for incorporating the terms on the back of the order—reinforces this impression); Matterhorn could not have forgotten that 18 months earlier it had signed an agreement that purported to supply the remaining terms for the individual purchase orders; and it probably assumed that those terms would continue to apply—at least so standard a term as an arbitration clause, also found on the back of the order. The terms on the back, by the way, may have appeared to be the only alternative to the Universal Agreement, or perhaps to be equivalent to the Agreement—remember that NCR had checked both boxes in the original purchase order. On the other hand, the presence of the boxes suggests that incorporation of the Universal Agreement was not automatic; and it is implausible to suppose that the parties meant the seller to have discretion to check or not check the boxes, as he pleased, *after* the buyer had signed the order. It would be a case of pulling the rug out from under the buyer for the seller to be able to say, "you thought you were governed by the Universal Agreement, but you're not, because I've decided not to check the box that incorporates it." And equally it would pull the rug out from under the buyer for the seller to say, "you thought you weren't subject to the Universal Agreement, but—surprise!—you are." The other box hadn't been checked either. The purchase order can therefore be interpreted, if barely, as giving the buyer two options that are not exclusive and a residual option—to be governed by the general law, with dispute resolution by courts rather than arbitrators.

NCR's big problem is its inability to give a reason why, if the Universal Agreement applied to the purchase order by its own terms, there was a box on the order form beside "Universal Agreement" with room for a check mark, and another box strongly implying that the buyer could if he wanted be governed by another set of terms. A juror would naturally be perplexed why NCR should purport to give a choice where it argued no choice was possible. NCR says that sheer inadvertence caused it to omit checking the box for incorporation of the Universal Agreement before forwarding the order to Matterhorn for Matterhorn's signature but has never explained why the purchase order seems to make incorporation optional. Another point in Matterhorn's favor is that in the first purchase order the box was checked before Matterhorn received it; and another is that (the jury could find) NCR had told Matterhorn after the cancellation of the previous order that "the contract" had been cancelled, which conceivably could have signified to a reasonable buyer in Matterhorn's position that the parties would be starting over from scratch, with the provisions of the Universal Agreement one option and the suppletive provisions of the Uniform Commercial Code another. As for the argument that the clause of the Agreement forbidding cancellation other than in writing shows that the Agreement must have applied to the 1980 purchase, we have already noted that the 1980 purchase order, itself a written document, could be viewed as consistent with the clause; the blank box for incorporation of the Universal Agreement reinforces the argument. And while it is true that another clause of the Universal Agreement recites that "the terms and conditions of this agreement shall prevail in spite of any contrary printed provision of any purchase order or other form *utilized by Customer*," the words we have italicized imply that NCR—the seller, not the customer—is free to use a deviant form, as it did, which left open the possibility that the purchase would be governed by

the terms on the back of the form rather than by the Universal Agreement.

Of course the box for incorporating the Universal Agreement may just have been intended to remind the buyer of the Agreement (the language of the accompanying legend, quoted earlier, so suggests); someone at NCR may just carelessly have failed to check the box before sending the order form to Matterhorn; and Matterhorn may have had no thought that the order would not incorporate the Universal Agreement merely because the box—both boxes—had been left blank. But we are not the triers of fact, and as we cannot say that the jury's verdict was irrational we must affirm the district court's order. Matterhorn has asked us to award it attorney's fees on this appeal on the ground that the appeal was frivolous. Matterhorn's request is itself frivolous, and is denied.

AFFIRMED.