**DAISY MANUFACTURING CO., INC., a Delaware Corporation, Plaintiff–Appellee,**

v.

**NCR CORPORATION, a Maryland Corporation, Defendant–Appellant.**

No. 93–3738.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1994.

Decided July 8, 1994.

Robert L. Deitz, Washington, DC, argued (James R. Greene, III, Dayton, OH and Charles L. Schlumberger, Little Rock, AR, on the brief), for appellant.

Laura J. Andress, Fayetteville, AR, argued (Tilden P. Wright III, Fayetteville, AR and Ralph Barbier, Jr., Grosse Point Woods, MI, on the brief), for appellee.

Before LOKEN, Circuit Judge, and JOHN R. GIBSON and FRIEDMAN *, Senior Circuit Judges.

* DANIEL M. FRIEDMAN, Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

FRIEDMAN, Senior Circuit Judge.

This is an appeal from an order of the United States District Court for the Western District of Arkansas **, denying a motion to compel arbitration and to stay court proceedings, on the ground that the parties had not entered into an agreement to arbitrate. We reverse and remand.

### I.

A. In 1976, the appellant NCR Corporation (NCR) entered into an agreement with Daisy Division Victor Comptometer Corporation governing the "terms and conditions" under which the customer would obtain "equipment, programs, and systems and maintenance services" from NCR. The contract, called a "Universal Agreement," was a detailed printed document that, according to NCR, it "typically signs ... at the onset of a commercial relationship with its customers." The "Universal Agreement" included the following arbitration provision:

> Disputes—Any controversy or claim, including any claim of misrepresentation, arising out of or related to this Agreement and/or any contract hereafter entered into between NCR and Customer, or the breach thereof, or the furnishing of any equipment or service by NCR to Customer, shall be settled by arbitration.

In 1980, NCR and Daisy executed a Universal Agreement Amendment, by which the customer agreed to include "NCR's copyright notice and any proprietary notice" on all copies made with NCR's consent of material NCR supplied. The agreement was signed for Daisy Manufacturing Co. by Frank Tarr, Vice–President Finance and Administration.

On November 15, 1983, Daisy Manufacturing Company, Inc., was created and "purchased certain of the assets of the Daisy Division" of Kidde Recreation Products, Inc., which in turn had acquired the Daisy Division from Victor Comptometer Corp. Frank Tarr, who had signed the Universal Agreement Amendment as Vice–President Finance

and Administration of Daisy Manufacturing Co., assumed the same position in the new entity.

Daisy Manufacturing Company, Inc., continued the same line of business as Daisy Manufacturing Co., at the same address and with some of the same senior management.

Both before and after October 15, 1983, Daisy placed a number of orders with NCR for computers and computer-related equipment. Both NCR and Daisy used the names "Daisy Manufacturing Co." and "Daisy Manufacturing Co., Inc." interchangeably.

The record contains no evidence that after November 15, 1983, (1) Daisy told NCR (a) that a new entity had supplanted Daisy Manufacturing Co. or (b) that the Daisy Manufacturing Co. with which NCR continued to deal was not the same company with which it had previously dealt for a number of years, or (2) that when NCR continued to show Daisy Manufacturing Co., as the customer, Daisy attempted to correct the alleged improper designation.

In a February 9, 1984 letter to NCR, the Vice–President–Controller of Daisy, confirming his "verbal cancellation of the NCR Consulting Service Order dated November 4, 1983 in the amount of $150,000," stated that "[a]s a result of the company being purchased by new management and the related bank loan requirements, we are not in a position to implement the total package of software and hardware which had been scheduled for 1984 and 1985."

B. In October 1991, Daisy ordered from NCR the computer system that gave rise to this litigation. Mr. James Moody, as Executive Vice–President and Chief Financial Officer, signed the purchase order for "Daisy Manufacturing Co." The purchase order included the following statement:

> ☐ Except as indicated below, furnishing of equipment, programs and/or services specified herein shall be pursuant to the terms of the Universal Agreement entered into by NCR and Customer.

---

** The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

☐ Terms and conditions on reverse side apply.

On the reverse side, the purchase order form set forth various terms, including the following arbitration clause:

DISPUTES—Any controversy or claim, including any claim of misrepresentation, rising out of or related to this Agreement or the breach thereof, or the furnishing of any equipment or service by NCR to Customer, shall be settled by arbitration.

Daisy did not check either box.

Daisy's complaint states that "[i]mmediately upon the delivery" of the computer software "Daisy began experiencing numerous problems which have greatly compromised the performance and operation of their business."

C. In April 1993, Daisy Manufacturing Co., Inc., filed the present district court diversity action against NCR and another company, which has been dismissed from the suit. The complaint accused NCR of breach of contract (the October 1991 purchase order), fraud, and violation of the Racketeer Influenced and Corrupt Organizations Act [RICO], 18 U.S.C. § 1961 et seq. (1988).

NCR moved, pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. (1988) and the Arkansas Uniform Arbitration Act, Ark.Code Ann. §§ 16–108–201 (1987), to compel arbitration and to stay the judicial proceedings. In a 10–page letter opinion, the district court denied the motion because it "cannot say that Daisy is contractually bound to arbitrate the disputes that are the subject of this action." The court held that

NCR has failed to show that Daisy [Manufacturing Co., Inc.] signed, agreed to adopt, affirmatively adopted, or is deemed by operation of law to have adopted the 1976 universal agreement ... The mere fact that Daisy as a newly formed corporation continued a business relationship that had previously existed between NCR and the Daisy Division of a separate corporation is insufficient to subject Daisy to the agreement ... Daisy was incorporated in 1983 and thus became a separate and distinct legal entity. The fact that it may have had the same or some of the same officers, directors, or shareholders, or continued business at the same physical location is insufficient to allow the court to disregard the corporate existence.

The court apparently concluded that Daisy's failure to check either box on the purchase order prevented the application of the arbitration provision on the reverse side of that order.

We have jurisdiction under 9 U.S.C. § 16(a)(1)(A) and (a)(1)(B), to review the district court's order refusing to compel arbitration and to stay court proceedings. *See Gammaro v. Thorp Consumer Discount Co.,* 15 F.3d 93, 95 (8th Cir.1994).

## II.

As the district court stated, before a party may be compelled to arbitrate under the Federal Arbitration Act, the court must engage in a limited review to ensure that the dispute "is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement. *PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990)." "Ordinary contract principles determine who is bound by such written provisions and of course parties can become contractually bound absent their signatures.... *A/S Custodia v. Lessin International, Inc.,* 503 F.2d 318, 320 (2d Cir. 1974), quoting, *Fisser v. International Bank,* 282 F.2d 231, 233 (2d Cir.1960)." "[A]lthough a party is bound by an arbitral award only where it has agreed to arbitrate, an agreement may be implied from the party's conduct. [*In the matter of Keystone Shipping and Texport Oil,* 782 F.Supp. 28, 30 (S.D.N.Y.1992) ] (citations omitted)."

The district court held that Daisy Manufacturing Co., Inc. was not bound by the arbitration provisions in the amended Universal Agreement because those documents had been signed not by that entity but by its predecessors, Daisy Division Victor Comptometer Corporation and Daisy Manufacturing Co. The court stated that "[t]he mere fact that Daisy as a newly formed corporation continued a business relationship that had previously existed between NCR and the

Daisy Division of a separate corporation is insufficient to subject Daisy to the agreement.... The fact that it may have had the same or some of the same officers, directors, or shareholders, or continued business at the same physical location is insufficient to allow the court to disregard the corporate existence."

The issues, however, were not whether the new corporate entity "continued a business relationship that had previously existed" between its predecessors and NCR or whether the court should "disregard the corporate existence" of Daisy Manufacturing Co., Inc. The issues were (A) whether the course of dealing between the parties after Daisy Manufacturing Co., Inc. was formed in 1983, in which both treated the latter as the same customer as its predecessor Daisy Manufacturing Co., bound Daisy Manufacturing Co., Inc. to the arbitration provision of the amended Universal Agreement that the predecessor had signed, and (B) whether Daisy Manufacturing Co., Inc. was not bound by the arbitration provision in the Universal Agreement or the purchase order agreement because it had not checked either box on the purchase order to indicate which terms and conditions it wanted to govern the computer system purchase order. We hold that the district court erred in both of the grounds upon which it concluded that Daisy Manufacturing Co., Inc. was not bound by the arbitration provision of the Universal Agreement or the purchase order.

■ A. Daisy Division signed the Universal Agreement in 1976 and Daisy Manufacturing Co. signed the 1980 amendment of the agreement. The Universal Agreement contained a broad arbitration clause that covered "any controversy or claim" related to "any contract hereafter entered into between NCR and Customer." After Daisy Manufacturing Co., Inc. was formed in 1983, Daisy and NCR continued to deal as they had in the past. The customer on purchase orders continued to be shown as Daisy Manufacturing Co. and Daisy never informed NCR that that company no longer was the customer with which NCR was dealing. Although in a 1984 letter to NCR Daisy stated that "[a]s a result of the company being purchased by new management," that statement cannot be viewed as a notice to NCR that a new entity had taken over Daisy's business. Rather, it suggested only that new management had acquired Daisy and would continue to operate the existing company. The letter also stated that "I look forward to working with you on our future Data Processing projects."

Although Daisy continued its business with NCR, it never told NCR that it no longer was Daisy Manufacturing Co. but had become Daisy Manufacturing Co., Inc. Nor did Daisy ever suggest to NCR that because the new entity was not a party to the amended Universal Agreement, it was not bound by that agreement. To the contrary, Daisy and NCR continued to do business in the same way they previously had done.

In these circumstances, we conclude that by its conduct, Daisy Manufacturing Co., Inc., ratified and accepted the amended Universal Agreement that its predecessor had signed and, therefore, is bound by it. *See In the Matter of Hart Ski Mfg. Co.*, 711 F.2d 845, 846 (8th Cir.1983) ("the record evidence, including the parties' subsequent course of dealings, shows that they had agreed to arbitrate this dispute."); *Heaton Dist. Co. v. Union Tank Car Co.*, 387 F.2d 477, 481 (8th Cir.1967) (even if written franchise agreement invalid, parties bound by it because, by operating under it, they ratified and accepted it). *See also Iowa Power and Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796, 809 (8th Cir.1981) (sustaining an Interstate Commerce Commission determination that the "course of conduct" of the parties "demonstrated the requisite intent to be bound" by a specific rate); *Pervel Industries, Inc. v. TM Wallcovering, Inc.*, 871 F.2d 7, 8 (2d Cir. 1989) ("[w]here, as here, a manufacturer has a well established custom of sending purchase order confirmations containing an arbitration clause, a buyer who has made numerous purchases over a period of time, receiving in each instance a standard confirmation form which it either signed and returned or retained without objection, is bound by the arbitration provision.").

■ Daisy Manufacturing Co., Inc. argues that it could not be bound by the amended Universal Agreement because that agree-

ment prohibited any assignment of the agreement or equipment obtained thereunder without NCR's prior written consent, and NCR never consented to any assignment by Daisy Manufacturing Co. to Daisy Manufacturing Co., Inc. Because NCR was not aware of such assignment, necessarily it could not have consented to it.

As NCR points out, however, this provision "was designed to provide some protection to NCR against irresponsible purchasers." Daisy cannot invoke the non-assignment provision to avoid its obligations under the amended Universal Agreement. *See Heaton Distributing Co.*, 387 F.2d at 481.

■ B. The next question is whether Daisy's failure to check either box on the purchase order avoided Daisy's obligation under the Universal Agreement (and the purchase order itself) to arbitrate its dispute with NCR. The failure to check did not have that effect.

The two boxes gave Daisy the opportunity to decide whether the terms governing the computer system sale would be those in the "Universal Agreement entered into by NCR and customer" or those on the reverse side of the purchase order. The purchase order thus reflected the parties' understanding that the customer had entered into, and was bound by, the Universal Agreement. The arbitration clause of the Universal Agreement covered any dispute "arising out of or related to . . . any contract hereafter entered into between NCR and Customer . . .," which included the 1991 purchase order.

The box-checking provisions thus gave Daisy the opportunity to have the terms on the reverse side of the purchase order rather than those in the Universal Agreement govern the particular transaction. That provision, however, cannot fairly be interpreted as giving Daisy a third choice: avoiding the application of either the Universal Agreement or the purchase order by not checking either box. The effect of Daisy's failure to check either box was to confirm the applicability of the Universal Agreement to the particular purchase contract between NCR and its customer, as the Universal Agreement contemplated.

The Fifth Circuit dealt with virtually the identical issue in *Brook Mays Music Co. v.*

*National Cash Register Company*, 838 F.2d 1396 (1988). There Brook Mays had signed the Universal Agreement with NCR. NCR furnished a computer system that was unsatisfactory and then agreed to substitute another system. Brook Mays signed a purchase order for the second system, but failed to check either box. When Brook Mays subsequently sued NCR over the second system, the district court granted NCR's motion to stay the judicial proceedings pending arbitration. In affirming, the court of appeals stated:

> [W]e note that even if the purchase order is construed as an offer of modification by NCR, the purchase order makes clear that NCR's sole offer was to allow Brook Mays to check either box; and under either alternative, Brook Mays would be contractually obligated to arbitrate any dispute. Thus, there are no terms in the purchase order that would modify the arbitration clause found in the Universal Agreement even if the purchase were a modification.

*Id.* at 1399

Daisy relies on the earlier decision of the Seventh Circuit in *Matterhorn Inc. v. NCR Corporation*, 763 F.2d 866 (1985). That case involved a similar situation, and the district court, on being requested to stay Matterhorn's suit for breach of contract and to order arbitration, submitted to the jury the question whether the purchase order on which Matterhorn had not checked either box incorporated the arbitration clause of the Universal Agreement. The jury answered that question "no" and the court refused to order arbitration. The court of appeals affirmed, on the ground it could not say that the jury verdict was "irrational". *Id.* at 875.

Daisy points to the following statement in the opinion:

> The purchase order can therefore be interpreted, if barely, as giving the buyer two options that are not exclusive and a residual option—to be governed by the general law, with dispute resolution by courts rather than arbitrators.

*Id.* at 874.

This passing dictum is insufficient to refute our reasoning above. More in point is the following statement in *Matterhorn:*

The question of arbitrability ought to turn not on what the method of supersession is called, but on whether the court can infer from the whole course of dealings between the parties that they intended the arbitration clause in their initial contract to govern disputes arising out of the alleged attempt to supersede that contract.

*Id.* at 873.

Here, as we have shown, "the whole course of dealings between the parties" indicates that they understood and intended that the Universal Agreement signed by Daisy Manufacturing Co., Inc.'s predecessors, which included the arbitration provision, would "govern disputes" arising out of or relating to the purchase of the computer system by Daisy from NCR.

If, when it signed the purchase order, Daisy did not want to be bound by the arbitration provisions of either that order or the Universal Agreement, it could have explicitly so stated on the purchase order by writing something like "no arbitration of any dispute arising out of this purchase order." That would have alerted NCR to Daisy's position and given NCR the opportunity, if it did not want to do business on that basis, to decline to sell the computer system to Daisy. Daisy's mere failure to check one of the boxes on the purchase order, however, did not vitiate its continued obligation to arbitrate the dispute under the Universal Agreement.

## III.

A. Because it concluded that Daisy Manufacturing Co., Inc., was not bound by the arbitration provisions of the Universal Agreement and the purchase order, the district court found it unnecessary to consider the second condition required "[b]efore a party may be compelled to arbitrate under § 4 of the Arbitration Act.... 'that the specific dispute falls within the substantive scope of that Agreement.'" (quoting *Paine-Webber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3rd Cir.1990)). "In making this determination, the court must operate under a 'presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitra-

tion clause is not susceptible of an interpretation that covers the asserted dispute."'" *PaineWebber,* 921 F.2d at 511 (quoting *AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986)).

■ Ordinarily, we do not decide issues that the district court did not adjudicate. *E.g., Occhino v. United States,* 686 F.2d 1302, 1311 (8th Cir.1982). We have made an exception to that practice, however, in arbitration cases.

■ In *N & D Fashions, Inc. v. DHJ Industries, Inc.,* 548 F.2d 722, 728 (8th Cir. 1977), the district court held that the parties had not entered into an agreement to arbitrate and therefore did not decide whether, if there were such an agreement, it covered the particular dispute. We ruled that the parties had agreed to arbitrate, and then held that the arbitration agreement covered the dispute. *Id.* at 728–9. The Supreme Court in effect has approved this practice. In *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the Court held that the court of appeals had acted within its discretion in deciding that the arbitration provision covered the claims involved, even though the district court had not decided those issues because it held the parties had not agreed to arbitrate. The Court stated that the court of appeals "acted within its authority in deciding the legal issues presented in order to facilitate the prompt arbitration that Congress envisaged." *Id.* at 29, 103 S.Ct. at 944.

NCR urges us to decide the question and to hold that the arbitration provision covers Daisy's claims. Daisy does not discuss whether we should decide the issue, but argues vigorously that "it would be fundamentally unfair and unconscionable to require Daisy to arbitrate the claims asserted above," namely, that "NCR's attempt to use an arbitration clause in connection with the sale and lease of the computer equipment and software to Daisy was clearly the centerpiece of a willfully fraudulent scheme to sell equipment NCR knew would not perform as promised. The only way in which NCR could hope to continue to aggressively mar-

ket a product that was outdated, out of production, sitting in inventory and known to be defective without incurring cataclysmic tort liability is with the shield provided by an arbitration clause. So long as a customer could not discover internal facts and documents, intentional fraud could be concealed."

We conclude, in accordance with the intent of the Arbitration Act "for a summary and speedy disposition of motions or petitions to enforce arbitration clauses" (*Moses H. Cone Memorial Hospital,* 460 U.S. at 29, 103 S.Ct. at 944), that we should now decide that issue. The question is not difficult and the parties have briefed it.

B. We conclude that the arbitration clauses cover Daisy's claims against NCR. "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* at 24–25, 103 S.Ct. at 941 (footnote omitted).

The arbitration provisions in the Universal Agreement and the purchase orders are the same except that the purchase order provision does not include the reference to contracts subsequently entered into. The arbitration provision is extremely broad. It provides that "any controversy or claim, including any claim of misrepresentation arising out of or related to this Agreement ... or the breach thereof, or the furnishing of any equipment or service by NCR to Customer, shall be settled by arbitration." The provision covers the three claims Daisy asserted against NCR in its complaint.

The breach of contract claim is one that "aris[es] out of or [is] related to" the Universal Agreement and the purchase order agreement.

The fraud claim is that NCR "fraudulently concealed known defects in its hardware and software system and made false representations of material facts to Daisy," "made representations for the purpose of defrauding Daisy so that Daisy would purchase the 10000 Series and license Symplex Software

and Plaintiff justifiably relied upon said representations and sustained damage," "failed to disclose present material facts which it had a duty to disclose, as it was representing to Daisy that it had a solution for Daisy's computer needs and represented to Daisy that it was an expert in the field," and "warranted that the capacity and performance capabilities of the hardware/software system would be sufficient to satisfy the standards set forth in the purchase agreement, and NCR breached its warranty in that its hardware/software were unable to accommodate in a timely manner the needs of Daisy." All of these allegations of fraud relate to NCR's alleged misrepresentations in connection with the sale of the computer system, not NCR's inclusion of the arbitration clause in the Universal Agreement. The arbitration provision specifically covers "any claim of misrepresentation" "arising out of or relating to this Agreement." It covers Daisy's fraud claims. *N & D Fashions,* 548 F.2d at 728.

Daisy's RICO claim is that NCR engaged in a scheme to deprive Daisy of its property by convincing Daisy "to purchase a computer system." Civil RICO claims are subject to arbitration. *Nesslage v. York Securities, Inc.,* 823 F.2d 231, 232, 235 (8th Cir.1987). Daisy's RICO claim also "arises out of or [is] related to" the contract with NCR and the arbitration provision covers it.

■■■ Daisy contends that NCR's arbitration clause "was the centerpiece of NCR's fraudulent scheme." This claim is difficult to comprehend, since Daisy and NCR entered into the Universal Agreement in 1976 and the amended Universal Agreement in 1980, but did not enter into the purchase order until 1991. NCR hardly could have contemplated this particular 1991 sale 15 years earlier, when it entered into the Universal Agreement containing the arbitration clause. The allegations of fraud relate to NCR's conduct in inducing Daisy to enter into the 1991 contract, not in inducing Daisy to accept the arbitration provision that that contract and the earlier agreements included. "[A] claim of fraud in the inducement to enter the contract, because it does not go to the 'making [and performance] of the agreement to arbitrate,' is properly left to the arbitrator."

*N & D Fashions,* 548 F.2d at 728 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967).

The order of the district court is reversed, and the case is remanded with instructions to order arbitration and stay the judicial proceedings pending such arbitration.