2022 IL App (1st) 220722-U

No. 1-22-0722

Order filed September 15, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| GREGORY J. HARRIS, Individually and Derivatively on Behalf of JG Holdings, LLC d/b/a Suspended Solutions, | ) Appeal from the<br>) Circuit Court of<br>) Cook County. |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) No. 21 CH 6293 |
| JEROME E. MARTIN III; BURKE, WARREN, MACKAY & SERRITELLA, P.C.; STEPHEN C. VORIS; MY 5D HEALTH, LLC; JG HOLDINGS, LLC d/b/a Suspended Solutions; and BANK OF AMERICA, | ) |
| Defendants | ) |
| | ) Honorable |
| (Jerome E. Martin III and JG Holdings, LLC, Defendants-Appellees). | ) Michael T. Mullen,<br>) Judge, presiding. |

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgment is affirmed where the trial court properly granted defendant Martin's motion to compel arbitration and denied plaintiff Harris's motion to stay arbitration.

¶ 2    Plaintiff Gregory Harris and Defendant Jerome Martin III are 50-50 partners in JG Holdings, LLC, doing business as Suspended Solutions (the Company), a company in the business of selling health supplements. Harris and Martin signed an operating agreement on July 18, 2018. In the proceedings below Harris contended that the two signed a new operating agreement in March 2021. Both agreements contained an identical arbitration provision. Martin filed an arbitration complaint based on the 2018 operating agreement. Harris filed a complaint in the circuit court based on the 2021 operating agreement. Martin filed a motion to compel arbitration on Harris's complaint, which the trial court granted nearly in total. Harris filed a motion to stay the arbitration on Martin's complaint, which the trial court denied in total. Harris appeals arguing that neither the claims in his nor Martin's complaint belonged in arbitration.

¶ 3    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 4                                   I. BACKGROUND

¶ 5    Harris and Martin are cofounders and equal shareholders in the Company. The Company was founded in December 2017 and the two entered into an operating agreement on July 18, 2018. The agreement contained an arbitration provision, which provided:

> Any dispute, controversy or claim arising out of or in connection with this Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration in the city in which the principle place of business of the Company is then located, pursuant to the commercial arbitration rules then in effect of the American Arbitration Association (or at any other time or place or under any other form of arbitration mutually acceptable to the parties involved). Any award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in a court of competent jurisdiction. The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided that each party shall pay for and bear the cost of its own experts, evidence and attorneys' fees, except that in the discretion of the

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

arbitrator any award may include the attorneys' fees of the party if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or in bad faith.

¶ 6    On April 27, 2021, Harris was sentenced to 6 years' imprisonment on a conviction of continuing financial crimes enterprise. In anticipation of Harris's impending absence from the Company, Harris and Martin discussed amendments to the Company's operating agreement. What happened next was highly disputed in the trial court. Thus, each party's position on what we will call the 2021 operating agreement will be summarized.

¶ 7    Harris submitted an affidavit stating that he and Martin met on March 16, 2021, to discuss changes to the 2018 operating agreement. The two went through an original, but unsigned, version of the 2018 operating agreement. When the two agreed on an amendment, Harris handwrote the amendment onto the operating agreement. After completing all amendments, the two signed the agreement. Later in the day, Harris and Martin participated in a Zoom call with attorney Steve McCann and Latanya Winfield. Winfield is Harris's mother. Harris stated that Martin agreed to the changes during the meeting. Martin and Harris intended to and did create a new operating agreement. Harris stated that the two signed the handwritten version because they were unsure if a typed-up version would be available for signature prior to Harris's incarceration.

¶ 8    The following changes were made to the 2018 operating agreement. Instead of being member managed, the Company would be managed by Winfield. Harris's salary would be $6000 per month and Martin's salary would be $4000 per month. Winfield had to approve of any monetary decisions and large financial decisions had to be approved by Harris. The new agreement provided that, in the event of sale, members would be paid out not by percentage but according to time worked, degree of work, physical actions taken to further the business, and loans made to the

business. Finally, the agreement was amended to include a provision that Martin could not make any material change to any aspect of the business unless approved by Harris or Winfield.

¶ 9    Martin submitted an affidavit stating that he never met in person with Harris on March 16, 2021. Martin neither witnessed Harris make handwritten changes nor did he sign the 2021 operating agreement. Martin participated in the Zoom call on March 16, 2021, via telephone. Martin expressed disagreement with many of Harris's proposed amendments and McCann instructed that Martin and Harris had to agree to any amendments because they were 50-50 managers. Martin did not sign or agree to any proposed amended operating agreement. The first time he saw the amended operating agreement with handwritten changes was on December 17, 2021, during the pending arbitration proceedings.

¶ 10    Both parties also submitted documentary exhibits purporting to support their positions about the validity of the 2021 operating agreement. For example, Harris submitted text messages between Martin and Winfield to establish that Martin was treating Winfield as the manager. Harris also submitted a screenshot of the Company's website showing that Winfield held the title of Chief Executive Officer. Martin submitted email messages between McCann and Harris indicating that amendments to the 2018 operating agreement were still being discussed after the March 16, 2021, meeting.

¶ 11    In September 2021, Martin filed an "Arbitration Complaint." Martin stated that he had "identified $206,224.80 in fraudulent transactions by Harris beginning in 2018 and continuing through at least as recently as July 2021." Martin continued that those actions deprived the Company of the use of the funds and artificially lowered the Company's net profits. The complaint consisted of four counts, including (1) judicial disassociation under 805 ILCS 180/35-45(6) (West 2020), (2) conversion, (3) breach of fiduciary duties, and (4) fraudulent inducement related to the

2018 operating agreement. Martin attached the 2018 operating agreement and Harris's sentencing order as exhibits to the complaint.

¶ 12    Harris filed a complaint in the circuit court of Cook County against Martin, a law firm retained by Martin, and another company formed by Martin. The complaint alleged that Martin "changed account passwords and swept monies from the company's bank accounts, converted the company's assets, started a new business in his own name and planned to either take 100% control of the business he started with Harris or misappropriate and transfer all of the company's assets to the new company he formed." Harris's complaint included the following claims: (1) scheme to defraud, (2) breach of contract, (3) accounting, (4) conversion, (5) common law fraud, (6) civil conspiracy, (7) declaratory judgment, and (8) a derivative count. The complaint sought an injunction as to any of Martin's conduct that was inconsistent with the 2021 operating agreement. The complaint also asked the circuit court to declare that Martin's arbitration claims are not arbitrable and to stay the arbitration until the court decided the issue of Martin's claims' arbitrability. Finally, the complaint sought compensatory and punitive damages.

¶ 13    The parties then proceeded to litigate which of the claims, between the parties' respective complaints, were subject to arbitration. Harris argued that Martin's arbitration complaint was based on the unenforceable and superseded 2018 operating agreement. Thus, the claims were not subject to arbitration because they were not filed pursuant to a valid arbitration clause in an enforceable contract. Martin argued that while there was a dispute over which operating agreement was operative, both operating agreements included identical arbitration provisions. Martin and Harris had broadly agreed to arbitrate any disputes arising out of the operating agreement. Martin requested that the trial court deny Harris's motion to stay arbitration and to compel arbitration on any claims arising out of the operating agreement.

¶ 14    The trial court began by noting that the sole issue for a trial court to consider in the arbitration context is "whether an agreement exists to arbitrate the dispute in question." The trial court stated that an identical arbitration clause appeared in both the 2018 and 2021 operating agreements. Based on that, the trial court concluded that "both operating agreements are complete contracts that contain fully-enforceable arbitration agreements." The trial court recognized that the real issue in this case was which operating agreement was valid. The trial court cited authority for the proposition that when the validity of a contract is challenged, and not the validity of the arbitration provision within the contract, that issue is for the arbitrator to decide. Because neither party disputed the validity of the arbitration provisions, the issue of which of the 2018 and 2021 operating agreements was valid was to be decided by the arbitrator. The trial court granted Martin's motion to compel arbitration on all but one of the counts in Harris's complaint and denied Harris's motion to stay arbitration on Martin's complaint. The trial court entered its order on April 29, 2022, and Harris filed a notice of appeal on May 20, 2022.

¶ 15                                    II. ANALYSIS

¶ 16    On appeal, Harris argues that the trial court should have stayed arbitration on Martin's complaint where it was premised on the unenforceable and superseded 2018 operating agreement. Harris concludes that "where there is no enforceable contract, there can be no enforceable contract provision, arbitration or otherwise." Martin responds that the trial court's orders were proper because it is undisputed that both the 2018 and 2021 operating agreements contain the same arbitration clause. According to Martin, because Harris challenges the validity of the entire 2018 operating agreement, as opposed to the arbitration provision, the issue is appropriate for arbitration.

¶ 17 An order denying or compelling arbitration is injunctive in nature and falls within the scope of Illinois Supreme Court Rule 307(a)(1). Ill. Sup. Ct. R. 307(a)(1) (eff. Nov. 1, 2017). The only issue when reviewing a trial court's order in this interlocutory posture is "whether a sufficient showing was made to sustain the order of the trial court." *Menard County Housing Authority v. Johnco Const., Inc*., 341 Ill. App. 3d 460, 463 (2003). "Thus, the standard of review in an interlocutory appeal is whether the trial court abused its discretion." *Id*. "However, if the question presented is purely one of law, a reviewing court will apply the *de novo* standard." *Coe v. BDO Seideman, LLP*, 2015 IL App (1st) 142215, ¶ 12. "An agreement to arbitrate is a matter of contract, and the interpretation of a contract is a question of law subject to *de novo* review." *Id*.

¶ 18 Both operating agreements provide that "the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the State of Illinois." Illinois law provides that a "written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist for the revocation of any contract." 710 ILCS 5/1 (West 2020). "On application of a party showing an agreement described in Section 1, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration." 710 ILCS 5/2(a) (West 2020). However, "if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised." *Id*.

¶ 19 Based on these statutory provisions, the only issue for a trial court to decide is whether the parties agreed to arbitrate a particular dispute. In other words, "regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Buckeye Check Cashing Inc. v.*

*Cardegna*, 546 U.S. 440, 449 (2006); *Coe*, 2015 IL App (1st) 142215, ¶ 18. To hold otherwise, as our supreme court has noted, would undermine the policy favoring arbitration "by allowing the party seeking to avoid arbitration to do so by merely alleging that no contract existed." *Jensen v. Quik International*, 213 Ill. 2d 119, 128 (2004).

¶ 20    Here, the parties initial dispute revolves around which of the two operating agreements is operative. Harris claims that the 2021 operating agreement is operative and that the 2018 operating agreement is superseded and unenforceable. Martin claims that the 2021 operating agreement was never executed as he did not sign the document after Harris made handwritten changes. The validity or invalidity of each of the operating agreements is a question for the arbitrator. Harris attempts to distinguish *Buckeye* and *Coe* on the basis that they involved the validity or invalidity of a single contract, whereas this case involves the validity or invalidity of two contracts. We see this as a distinction without a difference. No one in this case challenges the validity of either arbitration provision and, thus, pursuant to *Buckeye* and *Coe* the issue of the validity or invalidity of the 2018 and 2021 operating agreements as a whole is a decision for the arbitrator.

¶ 21    What is not disputed is that each operating agreement contains an identical arbitration provision providing that "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement or any breach or alleged breach hereof shall, upon the request of any party involved, be submitted to, and settled by, arbitration." Thus, regardless of which operating agreement is currently valid, any dispute relating to the agreement would be subject to arbitration. This fact distinguishes this case from *Matterhorn, Incorporated v. NCR Corporation*, 763 F.2d 866 (7th Cir. 1985), relied on by Harris.

¶ 22    There, the parties signed a 1978 universal contract that included an arbitration provision. *Id*. at 869. The initial contract between the parties was subsequently cancelled. *Id*. The parties then

entered into another agreement. *Id*. For the second contract, Matterhorn filled out and signed a standard-form contract that did not include the arbitration provision. *Id*. When NCR completed the contract, it checked the box indicating that any disputes would be subject to arbitration. *Id.* The Seventh Circuit stated that the "question of arbitrability" turned on "whether the court can infer from the whole course of dealings between the parties that they intended the arbitration clause in their initial contract to govern disputes arising out of the alleged attempt to supersede that contract." *Id*. at 873. The court concluded that when "Matterhorn signed a contract that seemed not to incorporate any set of terms that contained an arbitration clause, it may have intended and reasonably believed that it would not be forced to arbitrate disputes arising under the contract." *Id*. The uncertainty around whether the parties intended to arbitrate issues arising out of the second contract made the issue one for the trial court to decide in the first instance. *Id*.

¶ 23    Here, unlike in *Matterhorn*, there was no change in positions on the arbitrability of disputes between the two operating agreements. Both the 2018 and 2021 operating agreements included identical arbitration provisions and, thus, the parties' intent to arbitrate any disputes arising out of the operating agreements is clear. Regardless of which operating agreement an arbitrator finds to be valid, the parties' claims would still be subject to arbitration. There are two possibilities. First, the 2018 operating agreement may be considered effective from its inception to present if the arbitrator finds that Martin never signed the amended agreement. Second, the 2018 operating agreement may be considered to have been effective from July 2018 to March 2021 if the arbitrator concludes that the parties in fact executed the 2021 operating agreement. In either instance, the parties' claims would be subject to arbitration, just on different terms depending on the arbitrator's resolution of the threshold issue.

¶ 24    Finally, for the first time in his reply brief, Harris argues that the trial court should have stayed the arbitration on count I of Martin's complaint where Martin requested that Harris be removed from the Company by judicial determination pursuant to 805 ILCS § 180/35-45(6) (West 2020). Illinois Supreme Court Rule 341(h)(7) provides that an appellant's opening brief "shall contain the contentions of the appellant and the reasons therefor." Ill. Sup. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). "Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. Sup. Ct. R. 341(h)(7).  Harris has also only cited general authority for the proposition that arbitration forgoes a judicial determination and that a trial court has the authority to disassociate a member pursuant to the Limited Liabilities Company Act. He has cited no legal authority for the proposition that an arbitrator cannot resolve a dispute around the disassociation of a member. Notably, the arbitration provision in both operating agreements provides that any "award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in a court of competent jurisdiction." Because Harris failed to raise this issue in his opening brief and has otherwise not provided a compelling reason to excuse that forfeiture, we decline to reach the merits of this issue.

¶ 25                                    III. CONCLUSION

¶ 26    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 27    Affirmed.